IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

LEAH LOVELLE BURDETTE,

     Plaintiff,

v.                          CASE NO. 2:09-CV-00071

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are briefs in support of judgment on the pleadings.

Plaintiff, Leah Lovelle Burdette (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on April 12, 2006, alleging disability as of October 1, 2004, due to chronic obstructive pulmonary disease ("COPD"), asthma, anxiety, depression, stomach problems, and arthritis.  (Tr. at 10, 88-91,

92-94, 110-16, 145-51 156-68.)  The claims were denied initially and upon reconsideration.  (Tr. at 10, 42-46, 47-51, 54-56, 57-59.) On April 20, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 60.)  The hearing was held on November 7, 2007 before the Honorable James P. Toschi. (Tr. at 21-37, 72-77.) By decision dated January 25, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 10-20.)  The ALJ's decision became the final decision of the Commissioner on November 28, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On January 27, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§

2

404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists

3

in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic pulmonary insufficiency, osteoarthritis, osteopenia of the left hip, and obesity. (Tr. at 12-15.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 16-19.)  As a result, Claimant cannot return to her past relevant work. (Tr. at 19.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as stock checker, mail clerk, and cashier which exist in significant numbers in the national economy. (Tr. at 20.)  On this basis, benefits were denied. (Tr. at 20.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 51 years old (birth date August 23, 1956) at the time of the administrative hearing (November 7, 2007). (Tr. at 117.) She has an eleventh grade education and a high school graduate equivalency diploma. (Tr. at 115, 192.) In the past, she worked as a home health aide, and as a restaurant manager, assistant manager, and crewman. (Tr. at 121.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

5

Physical Evidence

Progress notes covering the period from October 4, 2004 to November 15, 2006, show Claimant was treated fourteen times at Clay County Primary Health Care Center for a variety of complaints, including prescription renewals, general check-ups, carpal tunnel syndrome, anxiety, depression, COPD, asthma, bronchitis, smoking cessation advice, heartburn, gastric esophageal reflux disease ("GERD"), osteoarthritis, dermatitis, allergic rhinitis, neck pain, pelvic pain, oral candidiasis, and palpitations. (Tr. at 235-51.)

The Clay County Primary Health Care Center records show that Claimant's March 17, 2005 brain electroencephalogram ("EEG") and computed tomography ("CT") were deemed "normal". (Tr. at 261-62.) An echocardiogram ("EKG") dated March 24, 2005 showed "[n]ormal left ventricular systolic function. No pericardial effusion." (Tr. at 260.) A chest x-ray dated August 1, 2005, showed "[m]ild hyperaeration. Normal size heart. No evidence of acute pulmonary disease." (Tr. at 259.) An x-ray dated February 2, 2006 showed "osteopenia of the left hip." (Tr. at 255, 291.) Claimant underwent cervical spine and lumbosacral spine x-rays on February 9, 2006, which showed "osteoarthritis and narrowing between C5-C6 and C6-C7 vertebrae" and "minimal osteoarthritis and suspected Grade 1 spondylolisthesis between L4-L5." (Tr. at 254.) A lumbar spine x-ray dated May 2, 2007 found: "Five views of the lumbar spine are performed. Vertebral body heights and disc spaces are

6

well maintained.    There is minimal anterolisthesis of L4 in

relationship to L5.  There is no spondylosis.  Pedicles and spinous

processes are intact."  (Tr. at 290.)

On June 26, 2006, Claimant underwent a disability evaluation

by Miraflor G. Khorshad, M.D.  Dr. Khorshad made this observation

about Claimant's general appearance upon physical examination:

> This is a 49 year old, white female who appears her
> stated age, no respiratory distress.  She stands 67 1/4
> inches tall and weighs 199 pounds.  She limps with poor
> coordination.  No assistive device used.  She is able to
> get in and out of the examination table.  She is able to
> walk on her heels.  She is able to sit and squat with
> pain.  Both upper and lower extremity muscle strength is
> 4/5.

(Tr. at 186.)

Dr. Khorshad's diagnosis was "1. Rule out hyperactive airway;

2.  Osteopenia - left hip; 3.  Osteoarthritis, cervical and lumbar

spine."  (Tr. at 187.) He noted that she stated that she could do

her regular daily activities but could not hunt or fish.  (Id.)

On August 2, 2006, claimant underwent a ventilatory function

examination by Dr. Khorshad. (Tr. at 212-226.)  Dr. Khorshad found

Claimant had no evidence of bronchospasm and no acute respiratory

illness present.  (Tr. at 212.) The testing stated: "Risk of COPD:

17%; Risk if smoking stopped: 17%; Estimated Lung Age: 79 yrs;

Interpretation: Low FEV 1 suggests obstructive disorder."  (Tr. at

213.)  The report showed Claimant to be 67 inches tall, 199 pounds,

and smoking forty (40) cigarettes daily.  (Tr. at 215-226.)

On  December  14,  2006,  Claimant  underwent  posteroanterior

7

("PA") and lateral ("LAT") chest films which Mallinath Kayi, M.D. found to "reveal well aerated lung fields. Mild increase interstitial markings. No cardiomegaly. No significant change compared to prior x-ray." (Tr. at 266.) An arterial blood gas study was performed on the same date and marked "OK" by Dr. Kayi. (Tr. at 267.)

Progress notes covering the period from March 21, 2006 to May 17, 2007, show Claimant was treated six times at Primary Care Systems, Inc., Big Otter Clinic, for a variety of complaints, including carpal tunnel syndrome, chronic obstructive asthma, allergic rhinitis, depression, anxiety, restless legs, chronic lower back pain, and yeast infections. (Tr. at 292-305, 325.) Lab work done on May 2, 2007 states: "Labs look great!!" (Tr. at 303.)

Progress notes show Claimant was also treated on June 26, 2007 at Primary Care Systems, Inc., Big Otter Clinic, for a check up and on August 22, 2007 for vaginal and oral candida, abdominal pain, and UTI [urinary tract infection]. (Tr. at 321-25.) It is noted that Claimant was smoking 1 ½ packs per day of cigarettes and drinking two six packs weekly of alcohol. (Tr. at 322, 324.) Lab work done on October 26, 2007 states: "Labs look good." (Tr. at 326.)

Residual Functional Capacity Evidence

On August 16, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that

Claimant could perform medium work with the ability to frequently climb ramp/stairs, balance, stoop, kneel, and crouch; and to occasionally climb ladder/rope/scaffolds, and crawl(Tr. at 227-229.) The evaluator found no manipulative, visual, or communicative limitations.  Environmental limitations were unlimited except to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., and hazards.  (Tr. at 230-31.) The evaluator, A. Rafael Gomez, M.D., noted:

> Patient is not fully credible.  Her allegations are out of proportion to the medical findings.  She has neck and back pain due to OA [Osteoarthritis].  She also has spondylolisthesis L4-5.  Has findings of mild emphysema by chest x-rays and PFS.  Has obesity level I.  She is reduced to medium work.

(Tr. at 232.)

On February 20, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with the ability to frequently climb ramp/stairs, stoop, crouch, and crawl; and to occasionally climb ladder/rope/scaffolds, and balance.  (Tr. at 283-84.)  The evaluator found no manipulative, visual, or communicative limitations.  Environmental limitations were unlimited except to avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards.  (Tr. at 285-86.) The evaluator, Marcel Lambrechts, M.D., noted: "There are no great changes since the previous evaluation and her latest exam was OK. She has mild COPD and hypertension.  No new PFTS were done and her

arthritis has not changed much.  RFC is as before."  (Tr. at 287.)

<u>Psychiatric Evidence</u>

On July 16, 2006, Larry J. Legg, M.A., licensed psychologist, provided a Mental Status Examination of Claimant for the West Virginia Disability Determination Service.  (Tr. at 191-96.)  Mr. Leg noted that Claimant states that she "usually drink (sic) six beers...three or four times a week...smokes marijuana every day."  (Tr. at 193.)   Mr. Legg made these findings:

> <u>MENTAL STATUS EXAMINATION</u>: <u>Appearance</u>: Ms. Burdette has blue eyes and light brown hair.  She was appropriately casually dressed and well groomed.  <u>Attitude/Behavior</u>: Motivated, cooperative, and polite.  <u>Speech</u>: Adequate production, normal tones.  Orientation: Oriented x4. <u>Mood</u>: Slightly depressed and anxious.  <u>Affect</u>: Flat. <u>Thought Process</u>: Stream of thought is within normal limits.  <u>Thought Content</u>: Normal.  <u>Perceptual</u>: No evidence of hallucinations or illusions.  <u>Insight</u>: Good. <u>Psychomotor Behavior</u>: Normal.  <u>Judgment</u>: Within normal limits based on her response to the "mail it" question on the WAIS-III Comprehension subtest.  <u>Suicidal/Homicidal Ideation</u>: None.  <u>Immediate Memory</u>: Judged to be within normal limits as Ms. Burdette could repeat a list of four words given to her back to me immediately.  <u>Recent Memory</u>: Judged to be within normal limits as Ms. Burdette could recall four of the four words given to her 30 minutes prior to this request.  <u>Remote Memory</u>: Judged to be within normal limits based on clinical observations of her ability to recall details of her personal history. <u>Concentration</u>: Judged to be within normal limits based on a WAIS-III Digit Span subtest scaled score of 9. <u>Persistence</u>: Within normal limits as demonstrated by clinical observations of her ability to stay on task during today's mental status examination.  <u>Pace</u>: Within normal limits as observed during today's mental status examination.
>
> <u>SOCIAL FUNCTIONING</u>: <u>During the Evaluation</u>: Within normal limits based on clinical observations of her social interactions with me and others during the evaluation. <u>Self-reported</u>: Ms. Burdette claims to have a few good

friends.   She does interact with her family on an infrequent basis.  She occasionally goes shopping.  She is not a member of any church or organized community group.  She claims she leaves her home one to two times per week on average.  She goes to the Dollar Store every two weeks.  She attends her medical appointments.

DAILY ACTIVITIES: Typical Day: Ms. Burdette is generally out of bed by 6 or 7 a.m.  She goes to bed at 10 p.m. She eats three meals a day.  She stated "In the morning I always have a sore hip.  I make coffee.  I might work in my flowerbed. I make the meals and wash the dishes. She indicates that she works crossword puzzles and enjoys reading.  She noted, "I just don't do anything.  After dinner, I'm usually done."  She does complete laundry and basic household chores "in my own time."  Activities List: Ms. Burdette indicates she spends most of her day in her home performing household chores.  She leaves her home one to two times per week on average.

DIAGNOSES:

| | | |
|---|---|---|
| Axis I | 305.20 | Cannabis abuse. |
| | 305.0 | Alcoholic (sic) abuse. |
| | 309.28 | Adjustment disorder with mixed anxiety and depressed mood. |
| | | |
| Axis II | V71.09 | No diagnosis. |
| | | |
| Axis III | | Arthritis |
| | | Pain in hip and back. |
| | | COPD. |
| | | Asthma. |
| | | (By claimant report). |

(Tr. at 194-95.)

On August 1, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had affective disorders with "impairment(s) not severe" in the categories of affective disorders, anxiety-related disorders, and substance addiction disorders.  (Tr. at 198.)  Claimant was found to have an "adjustment disorder" (Tr. at 201, 203.)  Claimant had

mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 208.) The evidence did not establish the presence of "C" criteria. (Tr. at 209.) The evaluator, Debra Lilly, Ph.D., noted:

> The claimant is considered credible with regard to activities. She admits that she engages in a variety of activities. She uses substances frequently and this is determined to be her primary problem by CE [claim examiner]. She denies problems with these substances. The preponderance of the evidence suggests no severe functional limitations related to a mental disorder.

(Tr. at 210.)

On February 14, 2007, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had affective disorders with "impairment(s) not severe" in the categories of affective disorders, anxiety-related disorders, and substance addiction disorders. (Tr. at 268.) Claimant was found to have an "adjustment disorder with mixed anxiety and depressed mood vs. anxiety." (Tr. at 271, 273.) Claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 278.) The evidence did not establish the presence of "C" criteria. (Tr. at 279.) The evaluator, Tasneem Doctor, Ed.S., Ed.D., noted:

Ct. [Claimant] assessed for both DLI [date last insured] and DI [date insured] on this form as little time has passed since DLI [date last insured] of 12/31/06 and there is no evidence of significant changes in mental status since this time. Ct. [Claimant] appears partially credible. Ct. [Claimant] alleges having anxiety and depression. She also alleges difficulty with memory, concentration, completing tasks, understanding and following instructions. She states that she has never received OP [out-patient] or IP [in-patient] psych.[psychological] TX [treatment], but PCP [primary care physician] prescribes psychotropic meds [medications]. C/P/P [concentration, persistence, pace] and memory X 3 were WNLS [within normal limits]. Social functioning was also WNLS [within normal limits]. She states that she has a few friends and interacts occasionally with family members. She reports use of alcohol and marijuana, but denies that either substance interferes with daily life. ADL's [activities of daily living] do not indicate significant limitations, as she is able to cook, drive, shop and manage finances. FO did not observe problems during the teleclaim. There is no evidence of significant limitations due to a mental disorder.

(Tr. at 280.)

On June 13, 2007, Claimant underwent a Psychological Evaluation by Janice Blake, M.A., a licensed psychologist, upon referral from Claimant's attorney "for an evaluation to follow-up on her appeal for Social Security benefits." (Tr. at 306.) Ms. Blake found:

**EDUCATIONAL HISTORY:** The client reported that she...quit school in the twelve grade in order to leave home. She reported that she had never been retained nor had special education services. She stated usual grades as a "B" student. She stated that she had gotten her GED in 1980...

**SUBSTANCE ABUSE HISTORY:** The client reported that she began drinking alcohol at age 35, and had drank heavily until three years ago, reporting that she had "slowed down" after being prescribed medication...She reported

13

that she had first smoked marijuana at age 40, reporting that she continues to do so on occasion.  She again reported that she had used heavily until prescribed medication...

**CLINICAL INTERVIEW/MENTAL STATUS EXAM**: The client was transported by her husband... Rapport was easily established with the client who answered questions that were asked of her.  Speech was relevant and coherent with the ability to communicate considered average. Psychomotor activity was withing normal limits. Anxiety level appeared elevated to the situation.

The client came to the interview with a somewhat constricted range of affect with mood (observed) anxious. Stream of thought appeared logical, sequential, and coherent in nature.  She reported both excessive obsessions and compulsions, that she noted were excessive and intrusive since age 14 or 15.  No evidence was noted of hallucinations or delusions and the client denied homicidal ideations.  She did report suicidal ideations, with no plan.  Immediate memory functions appeared to be intact, however, remote memory functions appeared moderately impaired based on an inability to recall historical data.  Estimated intelligence appeared to be in the average range of intellectual functioning.

**TEST RESULTS**:
**Kaufman Brief Intelligence Test, Second Edition (K-BIT-2)**: This test is a screener of intellectual functioning. It correlates with the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III).  This screener was chosen over the more comprehensive measure due to noted symptoms of anxiety, as it is less like to increase anxiety levels. The K-BIT-2 has a mean of 99.6 and standard deviation of 14.3 for a female 50 years of age.  The client's observed scores are as follows:

| Subtest | Standard Score | Percentile Rank | Descriptive Category |
|---|---|---|---|
| Vocabulary | 105 | 63 | Average |
| Matrices | 103 | 58 | Average |
| K-BIT IQ Composite | 104 | 61 | Average |

Results are considered valid as suitable rapport was established, the client put forth good effort, there were no need for repetition or directions, and she worked at a suitable pace with good persistence.  Further, results correlate with her reported educational achievement and vocational history.

**Wide Range Achievement Test, Revision 4 (WRAT-4):** This assessment tool is used to yield quick, reliable, and valid results regarding an individuals academic standings in reading, spelling, and arithmetic. This test has a mean of 100 and a standard deviation of 15 points. The client's scores were as follows:

| Subtest | Standard Score | Grade Score |
|---|---|---|
| Word Reading | 111 | 12.9 |
| Sentence Comprehension | 103 | 12.9 |
| Spelling | 102 | 12.9 |
| Math Computation | 104 | 12.9 |
| | | |
| Reading Composite | 107 | |

These obtained scores are also considered valid for the same reasons stated above.

**Beck Depression Inventory - II (BDI-II):** This screener was administered to the client to assess severity of symptomatology. She received a total score of 35, out of a possible 63, which falls within the Severe range. Her responses correlate with her self report of symptoms.

**Beck Anxiety Inventory (BAI):** This screener was administered to the client to assess severity of symptomatology. She received a total score of 40 which falls within the severe range. Her report of symptoms correlate with her self report.

**DSM-IV DIAGNOSTIC IMPRESSIONS:**

| | | |
|---|---|---|
| Axis I: | 300.21 | Panic Disorder with Agoraphobia |
| | 296.33 | Major Depressive Disorder, Recurrent, Severe |
| | 300.3 | Obsessive-Compulsive Disorder |
| Axis II: | V71.09 | No Diagnosis. |
| Axis III: | COPD, Carpal Tunnel Syndrome, allergies, Bronchitis, "Tinnitis" (ringing in the ears), and Arthritis (by client report) | |
| Axis IV: | Problems in Primary Support Group: (The client reported minimal family support and a limited social support system) | |
| | Economic Problems: The client reported she has not worked since 2001. | |
| Axis V: | GAF = 55. | |

15

**TREATMENT RECOMMENDATIONS:**
1) The client would most likely benefit from continued individual psychotherapy to deal with symptoms. She reported that she had never told anyone about her counting behaviors that initially began when her father died, a possible suicide, that escalated until they became notable at age 14 or 15. The client should be open with her therapist concerning symptoms and if she feels this rapport will not develop, seek another provider that she can be open with.

2) The client would most likely benefit from a referral for psychiatric consultation. She reported she had been prescribed psychotropic medication by a physician at Westbrook Health Services, however, symptoms remain in the severe level. Consultation with the psychiatrist could be beneficial to her care.

(Tr. at 308-11.)

On August 28, 2007, Ms. Blake completed a form titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (Tr. at 312-15.) Regarding Claimant's "Understanding and Memory", Ms. Blake checked that Claimant's ability to remember locations and work-like procedures, and to understand and remember very short and simple instructions was not significantly limited. (Tr. at 312.) She found that Claimant's ability to understand and remember detailed instructions was mildly limited. (Tr. at 313.)

Regarding "Sustained Concentration and Persistence", Ms. Blake opined that Claimant was not significantly limited in her ability to carry out short and simple instructions and the ability to make simple work-related decisions. (Tr. at 313.) She found that Claimant was mildly limited in her ability to carry out detailed

16

instructions.  She found that Claimant was moderately limited in the ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure). (Tr. at 313.) She opined that Claimant was markedly limited in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 313.)

Regarding "Social Interaction", Ms. Blake opined that Claimant was not significantly limited in the ability to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. at 313-14.)  She found that Claimant was moderately limited in the ability to interact appropriately with the general public, to accept instructions, and to respond appropriately to criticism from supervisors.  (Tr. at 313-14.)  She stated that Claimant was markedly limited in the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes.  (Tr. at 314.)

17

Regarding "Adaptation", Ms. Blake found that Claimant was not significantly limited in the ability to be aware of normal hazards and take appropriate precautions.  (Tr. at 314.)  She opined that Claimant was mildly limited in the ability to respond appropriately to changes in the work setting.  (Tr. at 314.)  She stated that Claimant was markedly limited in the ability to travel in unfamiliar places or to use public transportation.  (Tr. at 314.)  Ms. Blake opined that the limitations assessed lasted 12 continuous months at the assessed severity and stated the date of onset of the limitations was June 13, 2007.  (Tr. at 314.)   Ms. Blake stated that her severity ratings were based on her one-time interview of Claimant dated June 13, 2007.  (Tr. at 315.)

On June 6, 2007, Roshan Hussain, M.D., a consulting physician with Westbrook Health Services, evaluated Claimant in a physician progress note.  Dr. Hussain wrote:

> **SUBJECTIVE**: She has been very anxious and nervous for a long time.  Didn't realize that it was anxiety until she broke down and went to the hospital.  Admitted and then was discharged home.  Patient states she is doing a little better since started on Lexapro.  Does still have a lot of anxiety on a daily basis.  The Vistaril helped her sleep but didn't help the anxiety.  Not taking the Xanax.  Still has a lot of back pain, chronic aches and pains.  Still smokes and has been trying to make a difference.  Will have the hot flashes as well time to time with mood changes.  Not thinking about hurting herself, though in the past did entertain thought of suicide.  Said that life is a lot better with being involved in the gardening around the home, reads books to keep her time and mind occupied.
>
> Patient seen doing very well.  Somewhat nervous though discussing her problems.

18

**ASSESSMENT:**
Axis I:  Anxiety with Depression, social problems, tobacco abuse.

**PLAN:** Advised that we'll continue with the Lexapro 20 mg a day.  Will add the Klonopin 0.5 mg one twice daily. Take the Vistaril as needed.  Discuss menopausal symptoms with her family physician.  Will see her back in one month or sooner.

(Tr. at 334.)

On July 9, 2007, Melanie Akalal, M.D., a psychiatrist with Westbrook Health Services, provided a "Comprehensive Psychiatric Evaluation" of Claimant from a referral of Dr. Christine Jones of the Big Otter Clinic for reported anxiety and depression.  (Tr. at 329-31.)  Dr. Akalal noted:

**CHIEF COMPLAINT:** "I have a lot of anxiety and depression."

**HISTORY OF PRESENT ILLNESS:** Patient reports her mood symptoms started around four to five years ago and she identifies the stressor as the death of her mother.  She describes depression lasting a whole day with frequent crying spells.  She has no motivation or desire to do anything... The patient describes occasional problems with memory like difficulty remembering names and faces and birthdays and phone numbers.  She is able to attend to activities of daily living.

**PAST PSYCHIATRIC HISTORY:** As mentioned, she has had the mood problem for the past four or five years.  She used to see a psychiatrist in Clay County Clinic and her primary care doctor also was following her mood symptoms. She was initially started on Lexapro which was increased to 20 mg and she has been on that now for three or four months.  She describes some improvement with Lexapro but complains of sexual side effects.  She has never had inpatient treatment.  She denies previous therapy prior to coming to Westbrook.  She has not needed to go the emergency department for panic attacks.

19

**PAST MEDICAL HISTORY**: Patient was involved in an automobile accident in 1990 which resulted in head trauma.  She had a CT scan done at that time which was negative.  She reports she had a repeat CT scan done around two years ago which was also negative... She does suffer from chronic bronchitis and arthritis.  She complains of back and hip pain. She last saw her primary care doctor, Dr. Jones, at the Big Otter Clinic one week ago...

**SUBSTANCE USE HISTORY**: Patient used to smoke one and a half packs per day but was able to quit smoking.  She drinks occasional beer.  Last time was last Thursday.  She drinks beer one to two times a week averaging around three to six cans per episode.  She has occasional marijuana one to two times a week.  The last use was last week and she consumed one joint...

**SOCIAL HISTORY**: Patient reports that her development was on time.  She finished 11 ½ years of schooling then got her GED.  She reports she had a B average in school.  Denies any behavior problems and describes herself as too shy to cause trouble.  She used to work in restaurants and was able to be promoted from crewman to manager.  She also worked in convenience stores and for the last nine years did home care but quit because she couldn't take the mental and emotional stress of the job... She is currently independent with activities of daily living.  She usually does the chores in the home during the day.  She has been married to this current husband for the last eleven years.  She has had a total of three marriages in all.  She reports that she always seems to gravitate towards the same type of person who tries to control her.  She has one daughter who is 31-years-old and she lives in Clay County and they keep in contact.  Currently she is also stressed out by dealing with her daughter, her husband and her best friend Mary who is also dealing with a lot of social problems.

**MENTAL STATUS EXAMINATION**: The patient was seen wearing casual clothes.  She was fairly kempt.  She was cooperative with fair eye contact.  Her speech was spontaneous.  There was no note of psychomotor retardation or agitation.  Her mood was depressed and anxious.  Her affect was appropriate.  She denied any current auditory or visual hallucinations.  There were no delusions elicited.  She denied any suicidal or homicidal ideation, plan or intent.  She was oriented x's three.

Her responses were goal directed.  She has fair insight and judgment into her condition.

**DIAGNOSTIC IMPRESSION:**

Axis I:    Major Depressive Disorder, Moderate, Recurrent
           without  Psychotic  Features,  296.3;  Panic
           Disorder without Agoraphobia, 300.01; Anxiety
           NOS, 300.00
Axis II:   Deferred.
Axis III:  History  of  Automobile  Accident  and Head
           Trauma.  Chronic Bronchitis.  Arthritis.
Axis IV:   Poor Social Support.
Axis V:    GAF = 60.

**PLAN**: Patient currently receiving therapy with Jeff and advised  to  continue.   Went  over  some  relaxation techniques including breathing and focusing to help with the panic attacks.  Patient reports some improvement with Lexapro but on 20 mg already and complaining of sexual side  effects  and  wants  to  be  switched  on  other medications.  Discussed options and she finally agreed to starting Cymbalta 20 mg and seeing how she tolerates the medication.  Discussed risks, benefits, and alternatives to Cymbalta and she was agreeable to prescribing this medication for her.  Will decrease Lexapro to 10 mg daily for the first three days and then discontinue.  Cymbalta to  be  adjusted  by  Dr.  Hussain  as  needed.   Continue Klonopin 0.5 mg twice a day as needed for anxiety.

(Tr. at 330-31.)

On July 11, 2007, Dr. Hussain, a consulting physician with

Westbrook Health Services, stated in a physician progress note:

**SUBJECTIVE**: Patient is in the office here stating she is doing  fairly  well.   Has  seen  the  psychiatrist. Medication adjustments were being done.  Stated that she is tapering off her Lexapro and has started on the Cymbalta 20 mg and the Klonopin which seems to help her with the anxiety.  Stated she is not as anxious before but somewhat of a depressed mood.  Also stated that she hasn't had much of a libido, sexual drive has been decreased.  Has not addressed this with her OBGYN yet. Otherwise, has been doing fair.  Patient is here with Mary Wildfire the case manager.  She is not suicidal. Stated that her quality of life is fair.

Patient seen doing very well.  Very concerned about her decreasing libido.  Has been having some hot flashes from time to time.  She has not addressed this concern with her physicians and still smokes.

**ASSESSMENT:**
Axis I:  Anxiety with Depression, social problems, tobacco abuse, decreased libido.

**PLAN:** Will continue with the Cymbalta, increase the dose to 30 mg, Klonopin 0.5 mg twice daily and discontinue the Lexapro.  Recommend to discuss her decreased libido with her OBGYN and strongly recommended to estrogen replacement.  Continue to monitor.  Will see her back in one month.

(Tr. at 333.)

On August 22, 2007, Dr. Hussain's physician progress note

states:

**SUBJECTIVE:** Patient seen in the office here doing fairly well.  Stated that the Cymbalta 30 mg dosing has done very well.  Not as anxious or stressed.  Able to cope better facing crowds.  Not as anxious or nervous but still would have some anxiety, especially staying in a crowd for more than half an hour.  Family reunion recently has been fair but could not tolerate the crowd for too long.  Not suicidal, not having any thoughts of.  Seems to be enjoying life a lot better today.  Was not able to speak with her regular physician regarding her OBGYN issues.

Patient seen doing very well here today.  Very interactive.  Feels more upbeat.  Not suicidal and is enjoying her life.  Medication seems to do very well.  Still has a lot of hot flashes, decreasing libido.

**ASSESSMENT:** Axis I: 296.32, 300.00; Axis II: V71.09; Axis III: Arthritis, COPD; Axis IV: Economic problems; Axis V: Moderate symptoms.

**PLAN:** Will continue with the Cymbalta 30 mg a day.  If in two weeks the depression and anxiety recur, may increase the dosing to 60 mg per day but let the office know what changes are being made and call for the order appointment.  Continue with her Klonopin at 0.5 mg twice

22

daily.  Patient seen doing very well, interactive, not
suicidal.  Will see her back in two month.

(Tr. at 332.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not
supported by substantial evidence because in determining Claimant's
residual functional capacity, the ALJ failed to include any
limitations resulting from depression and anxiety.  (Pl.'s Br. at
8-13.)

The Commissioner argues that the ALJ's findings are supported
by substantial evidence and should be affirmed because the medical
evidence supports the ALJ's conclusion that Claimant's mental
complaints do not rise to the level of a severe impairment and that
Claimant's physical complaints are not disabling. (Def.'s Br. at 9-
15.)

Residual Functional Capacity Findings

Claimant asserts that the ALJ erred concerning Claimant's
residual functional capacity.  Claimant argues that the ALJ's
finding is not supported by substantial evidence because the ALJ
failed to include any limitations resulting from depression and
anxiety.  (Pl.'s Br. at 8-13.)

With regard to Claimant's alleged mental impairments, the ALJ
made these findings:

[O]n July 14, 2006, Larry Legg, M.A., performed a
consultative psychological evaluation of the claimant.
The claimant reported that she had never received any

outpatient community mental health services.  She also
reported that she had never been hospitalized for any
psychiatric or psychological reasons.  On mental status
examination, the claimant's mood was slightly depressed
and anxious, and her affect was flat.  The claimant's
judgment was within normal limits.  The claimant's recent
memory, remote memory, and immediate memory were within
normal limits.  The claimant's concentration was within
normal limits.  The claimant's social functioning was
within normal limits.  The impressions were cannabis
abuse, alcoholic abuse, and adjustment disorder with
mixed anxiety and depressed mood (Exhibit 5F).

On June 13, 2007, Janice Blake, M.A., a licensed
psychologist, performed a psychological evaluation of the
claimant.  On mental status examination, the claimant's
speech was relevant and coherent.  Her psychomotor
activity was within normal limits.  She had a somewhat
constricted range of affect with anxious mood.  Her
remote memory appeared moderately impaired but her
immediate memory was intact.  The impressions were panic
disorder with agoraphobia; major depressive disorder,
recurrent, severe; and obsessive-compulsive disorder.
The claimant's global assessment of functioning level was
55 (Exhibit 15F).  On August 28, 2007, Ms. Blake
completed an assessment form based on her one-time
examination of the claimant and opined that claimant was
markedly limited in the ability to perform activities
within a schedule, maintain regular attendance, and be
punctual within customary tolerances; sustain an ordinary
routine without special supervision; work in coordination
or proximity to others without being unduly distracted by
them; complete a normal workday and workweek without
interruptions from psychologically based symptoms and to
perform at a consistent pace without an unreasonable
number and length of rest periods; get along with
coworkers or peers without unduly distracting them or
exhibiting behavioral extremes; and travel in unfamiliar
places or use public transportation (Exhibit 16F).  The
undersigned rejects the conclusions and limitations found
by Ms. Blake as this was a one-time examination and her
findings are not substantiated by any clinical findings
in the record.

On June 6, 2007, Rashan Hussain, M.D., reported that the
claimant was doing very well.  On July 11, 2007, the
claimant reported that she was doing fairly well.  She
had started a new medication and was not as anxious as

before.  On August 22, 2007, the claimant reported that the dosage of Cymbalta had done very well.  She was able to cope better facing crowds.  She was not as anxious or nervous as before.  She seemed to be enjoying life a lot better.  Dr. Hussain noted that the claimant was very interactive during the office visit (Exhibit 24F).

On July 9, 2007, Melanie Akalal, M.D., a psychiatrist at Westbrook Health Services, performed an evaluation of the claimant at the request of the claimant's treating physician at the Big Otter Clinic.  On mental status examination, the claimant was cooperative, and her speech was spontaneous.  Her mood was depressed and anxious, and her affect was appropriate.  She was oriented times three.  Her responses were goal-directed.  The impressions were major depressive disorder, moderate, recurrent without psychotic features; panic disorder without agoraphobia; and anxiety disorder, NOS.  The claimant's global assessment of functioning level was 60 (Exhibit 23F).

The undersigned notes that the claimant has never been hospitalized for a psychiatric or psychological reason.  The claimant had never received mental health treatment until she began treatment with Dr. Hussain.  The claimant reported that her symptoms improved with her medications.  Accordingly, the undersigned finds that the claimant has no severe mental impairment.

The claimant's medically determinable mental impairments of depression and anxiety, considered singly or in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.  In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living.  In this area, the claimant has mild limitation.  She makes coffee, and she works in her flower bed.  She prepares meals and washes the dishes.  She does laundry and basic household chores.

The next functional area is social functioning.  In this

25

area, the claimant has mild limitation.  She leaves home one to two times per week.  She reported having a few good friends.  She interacts with her family but on an infrequent basis.  She occasionally goes shopping.  She attends her medical appointments.  On August 22, 2007, the claimant reported being able to cope better facing crowds (Exhibit 24F).

The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitation.  She works crossword puzzles and enjoys reading.

The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of the mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12. 00 of the Listing of Impairments (SSR 9608).  Accordingly, the undersigned has translated the above "B" criteria findings into work-related functions in the residual functional capacity assessment below.  The record does not establish the presence of the "C" criteria.

(Tr. at 13-15.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity ("RFC") for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).

Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his
> limitations, the SSA must consider the entire record,
> including all relevant medical and nonmedical evidence,
> such as a claimant's own statement of what he or she is
> able or unable to do.  That is, the SSA need not accept
> only physicians' opinions.  In fact, if conflicting
> medical evidence is present, the SSA has the
> responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In this case, the ALJ determined that Claimant was capable of performing light work. (Tr. at 16-19.) The ALJ stated:

At the hearing the claimant testified that she has

27

breathing problems and has problems walking. She stated that she takes four medications for her breathing problems. She stated that she has arthritis in her back, hips, and knees. She stated that she has symptoms of anxiety and depression. She stated that at times she would stay home and not even watch television. She had panic attacks in which she had weakness, her heart raced, and her stomach got upset. She stated that these attacks occurred daily. She is not being treated by Dr. Hussain every three months.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning intensity, persistence and limiting effects of these symptoms are not entirely credible.

The undersigned finds that the claimant's allegations/symptoms are not supported by objective findings. During examination by Dr. Khorshad the claimant was able to walk on her heels. He reported that no respiratory distress was noted. There was no evidence of wheezing. She was able to get on and off the examining table. She was able to sit and squat but had pain. She used no assistive device. Examination of her extremities revealed no pedal or leg edema. There was no joint swelling or effusion. Neurological examination was intact (Exhibit 4F).

A chest x-ray performed on August 1, 2005, revealed only mild hyper-aeration and no evidence of acute pulmonary disease. Examination of the claimant's lungs on January 27, 2006, revealed that her breath sounds were equal bilaterally with no wheezes, rales, or rhonchi. Her lungs were clear to auscultation (Exhibit 9F/10).

An examination of the claimant on March 24, 2006, by her primary care physician revealed that her respirations were even and unlabored. The claimant's lungs were clear to auscultation. The claimant's breath sounds were equal. There was no evidence of wheezes (Exhibit 9F/6).

A blood gas study performed on December 14, 2006, was within normal limits (Exhibit 10 F/2).

As for opinion evidence, on August 16, 2006, A. Rafael Gomez, M.D., a reviewing physician at the state agency,

28

completed a Physical Residual Functional Assessment form and opined that the claimant was limited to medium work (Exhibit 8F). However, resolving all doubt in favor of the claimant the undersigned finds that the claimant is limited to the exertional demands of light work.

On February 20, 2007, Marcel Lambrechts, M.D., a reviewing physician at the state agency, completed a Physical Residual Functional Capacity Assessment form and opined that the claimant was limited to medium work (Exhibit 12F). However, resolving all doubt in favor of the claimant the undersigned finds that the claimant is limited to the exertional demands of light work.

On August 1, 2006, Debra Lilly, Ph.D., a reviewing psychologist at the state agency, completed a Psychiatric Review Technique form and opined that the claimant did not have a severe mental impairment (Exhibit 6F). Significant weight is given to this opinion as it is consistent with the evidence of record.

On February 14, 2007, Tasneem Doctor, Ed. S., Ed.D., a reviewing psychologist at the state agency, completed a Psychiatric Review Technique form and opined that the claimant did not have a severe mental impairment (Exhibit 11F). Significant weight is given to this opinion as it is consistent with the evidence of record.

(Tr. at 17-19.)

Claimant argues that the ALJ's RFC assessment did not comply

with the requirements of Social Security Ruling ("SSR") 96-8p

because the ALJ is required to

include any limitations from nonsevere impairments in the claimant's residual functional capacity if she suffers from at least one severe impairment...the ALJ failed to include any limitations resulting from depression and anxiety. Therefore, the Judge's decision is not supported by substantial evidence and must be reversed. In addition, the ALJ failed to include any limitations in standing or walking despite his conclusion that Mrs. Burdette's osteopenia of the left hip was a severe impairment... If Mrs. Burdette had limitations in standing and walking due to this severe impairment, she would be unable to perform light work.

29

(Pl.'s Br. at 12.)

The undersigned has carefully reviewed the ALJ's decision regarding his consideration of Claimant's depression, anxiety, and osteopenia of the left hip.  The ALJ's RFC assessment contains the requisite narrative discussion, including specific clinical and laboratory findings of record as well as Claimant's self-reported symptoms and daily activities.  The objective medical evidence does not demonstrate an impairment which would further reduce Claimant's capacity for light work.  In fact, the ALJ generously reduced the Claimant's RFC from medium, which was found in both RFC assessments of record.  (Tr. at 227-34, 282-89.)

The undersigned also notes that osteopenia is a common malady, wherein bone density is lower than normal but not low enough to be classified as osteoporosis.  In fact, it suggests only "an increased risk of osteoporosis."[1]  Additionally, Claimant has failed to provide medical evidence showing she has any limitations in standing or walking due to osteopenia.

It is noted that on June 26, 2006, Claimant underwent a disability examination by Dr. Khorshad who observed that while Claimant "limps with poor coordination," she used no assistive device, was able to get in and out of the examination table, and to walk on her heels. (Tr. at 186.)  He also noted that Claimant could

---

[1] The Merck Manuals Online Medical Library, http://www.merck.com/mmpe/sec04/ch036/ch036a.html.

30

do her regular daily activities. (Tr. at 187.) Claimant does housework, including dish washing, flower gardening, cooking, shopping, and taking care of pets. (Tr. at 133-135, 137.)

Further, the ALJ's decision thoroughly considered Claimant's depression and anxiety. Contrary to Claimant's assertions, the ALJ properly considered Claimant's mental health treatment and the opinions of Dr. Akalal and Ms. Blake. The ALJ considered the evidence and concluded that it demonstrated that Claimant's mental impairments imposed only "mild" limitations. (Tr. at 15.) The ALJ did not err in rejecting the conclusions of Ms. Blake, as they conflicted with the evidence of record, including the findings of the state agency psychologists (Dr. Lilly and Dr. Doctor), psychologist Larry Legg, and Claimant's treating physician, Dr. Hussain, who noted that her depression and anxiety symptoms markedly improved within weeks of her medication treatment and that she was "doing very well." (Tr. at 332-34.) It is noted that Dr. Hussain and Dr. Akalal are both medical doctors working from the same Roane County Westbrook Health Services Office.

Claimant also takes issue with the ALJ's failure to discuss her mental health treatment at Clay Primary Care which shows that Claimant was "prescribed Lexapro for depression as early as January 2006. (Tr. at 244.)" (Pl.'s Br. at 10.) The undersigned notes that the ALJ discussed numerous progress notes from Clay County Primary Care, and noted that on July 14, 2006, Larry Legg, M.A.,

31

performed a consultative psychological evaluation of Claimant, wherein Claimant reported that she had never received outpatient community mental health services, nor been hospitalized for any psychiatric or psychological reasons. (Tr. at 13-14, 193.) The undersigned finds that the ALJ's failure to discuss a prescription for Lexapro from a Clay County Primary Care nurse practitioner in January 27, 2006, is not a significant problem - especially in light of the ALJ's discussion of the psychological evaluation of Larry Legg on July 14, 2006. (Tr. at 13-14.)

Claimant argues that because her "claim was last before the State Agency in February 2007, (Tr. at 267), these two nonexamining psychologists [Drs. Lilly and Doctor] could not have reviewed the opinions of Dr. Akalal or Ms. Blake." (Pl.'s Br. at 11.) The medical evidence shows that Dr. Hussain examined Claimant twice after the evaluations of Ms. Blake and Dr. Akalal, and that he concluded that Claimant was "doing very well" in regards to her depression and anxiety. (Tr. at 332-333.) Further, Dr. Akalal clearly indicates in her evaluation that she and Dr. Hussain are working together in their treatment of Claimant's depression and anxiety. (Tr. at 331.) Therefore, Claimant's argument that "the Judge committed reversible error in rejecting the the (sic) opinion of a treating physician, Dr. Akalal, and an examining psychologist, Ms. Blake, in favor of nonexamining State agency psychologists and his own lay opinion" (Pl.'s Br. at 10) is without merit.

Accordingly, the undersigned proposes that the presiding District Judge FIND that the ALJ's RFC assessment meets the requirements of SSR 96-8p and is supported by substantial evidence of record.

Medical-Vocational Guidelines

Claimant argues that because she "was an individual who was closely approaching advanced age when the ALJ denied her claim, she was entitled to a finding of "disabled" pursuant to 20 C.F.R. Part 404, Subpart P, App. 2, §201.04 if she was limited to sedentary exertional rather than light exertion." (Pl.'s Br. at 9.)

Claimant also argues that "the ALJ did not make a finding concerning whether Ms. Burdette had any transferable skills, (Tr. 19, Finding No. 9), but vocational expert Nancy Shapiro testified that Ms. Burdette's work as a restaurant worker and as a health care worker did not give her any transferable skills." (Pl.'s Br. at 9, footnote 6.)

The undersigned proposes that the presiding District Judge FIND that the ALJ's decision that Claimant is limited to light work is supported by substantial evidence.  There is absolutely no evidence of record indicating that Claimant is restricted to sedentary exertion.  In fact, the vocational evidence unequivocally indicates Claimant to be capable of working at a medium exertional level and the ALJ generously reduced the Claimant's RFC to light. (Tr. at 16.)

Conclusion

After a careful consideration of the evidence of record, the undersigned proposes that the presiding District Judge FIND that the Commissioner's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn,

34

474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  December 1, 2009 
     Date

Mary E. Stanley
United States Magistrate Judge